IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

PROWESS, INC.,

    Plaintiff,

      v.                      CIVIL NO.: WDQ-11-1357

RAYSEARCH LABORATORIES, AB,
*et al.*,

    Defendants.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MEMORANDUM OPINION

Prowess, Inc. ("Prowess") sued RaySearch Laboratories, AB ("RaySearch") and others[1] (collectively, the "Defendants") for patent infringement. A claim construction hearing was held on December 14, 2012 ("Hr'g"). Pending are the Defendants' motions for leave to file amended answers to the second amended complaint, and counterclaims, and to supplement the record in support of their opening claim construction brief. Also pending are the disputed claim construction issues. For the following reasons, the Defendants' motion for leave to file amended answers will be denied; the Defendants' motion to supplement the record will be granted; and the disputed claims will be construed as discussed herein.

---

[1] Nucletron Corporation ("Nucletron") and Philips Nuclear Medicine, Inc., formerly known as Philips Medical Systems (Cleveland), Inc. ("Philips"). Second Am. Compl.

I. Background[2]

A. The Parties

Prowess is a California healthcare technology company with its principal place of business in Concord, California. Second Am. Compl. ¶ 1. Prowess and RaySearch, a Swedish healthcare technology company,[3] develop software for the optimization of cancer radiation therapy. Second Am. Compl. ¶ 1; RaySearch Answer to Second Am. Compl. ¶ 2. Nucletron manufactures cancer radiation therapy equipment and is allegedly a licensee of RaySearch's software. Second Am. Compl. ¶ 3; Nucletron Answer to Second Am. Compl. ¶ 3. Effective March 1, 2012, Nucletron was merged into Elekta, Inc. ("Elekta"), a Georgia corporation with its principal place of business in Norcross, Georgia. Nucletron Answer to Second Am. Compl. ¶ 3.[4] Philips is a California company with its principal place of business in Cleveland, Ohio. Philips Answer to Second Am. Compl. ¶ 4. Philips manufactures cancer radiation therapy equipment and is

---

[2] Facts common to the pending issues are included here; facts unique to the Defendants' motions are included in the analysis of the respective motion.

[3] RaySearch was founded in 2000 by Doctor Johan Löf--RaySearch's President and CEO--and other researchers from the Karolinska Institutet. Defendants' Opening Br. (SEALED) at 6.

[4] Elekta does business under the trade name "Nucletron Corporation" in Maryland. Nucletron Answer to Second Am. Compl. ¶ 3.

2

allegedly a licensee of RaySearch's software.  Second Am. Compl.
¶ 4; Philips Answer to Second Am. Compl. ¶ 4.

B. Radiation Therapy

Radiation therapy for cancer treatment involves shooting a
beam of radiation at a tumor to destroy the cancerous cells'
ability to reproduce.  Second Am. Compl. ¶ 12.  The radiation is
emitted from a linear accelerator ("linac"), which is mounted on
a gantry--essentially, a rotating base--and equipped with a
collimator ("MLC") whose moving "fingers" form an aperture[5] to
shape the radiation beam, thereby varying the dose received by
the tumor.  Second Am. Compl. ¶ 15; Joint Claim Constr.
Statement (SEALED) at 1; Popple Decl.[6] (SEALED) ¶ 20; Claim
Constr. Hr'g Tr. 6:22-25 to 7:1-4, 7:20-22, Dec. 14, 2012
[hereinafter, "Hr'g"].[7]  Typically, the gantry remains stationary
(in a "fixed-field" position) while the radiation is delivered.
Popple Decl. (SEALED) ¶ 21.[8]  In intensity-modulated radiotherapy

---

[5] I.e., a shaped opening.  Joint Claim Constr. Statement (SEALED)
at 1.

[6] "Popple" is Prowess's expert, Doctor Richard A. Popple.

[7] The radiation delivered from each aperture is called a
"segment."  Popple Decl. (SEALED) ¶ 20.

[8] Fixed-field also describes treatment where the gantry is
rotated between fixed-field beams.  See Popple Decl. (SEALED) ¶
21.  The beam is "off" while the gantry is rotating.  See Hr'g
7:7-13.

("IMRT"), the intensity of the radiation[9] is modulated within each delivered field. '008 patent col. 1 ll.64-66. A gantry may also deliver radiation while moving in arcs ("intensity modulated arc therapy," or "IMAT"). *See id.* col. 2 ll.55-56. In IMAT, the radiation beam remains "on" while the gantry is moving. *See* Hr'g 7:14-15.

In the process of delivering radiation, adjacent healthy organs and tissue may suffer collateral damage. Second Am. Compl. ¶ 12. To decrease this risk, physicians use computer software to develop treatment plans that adjust the intensity, shape, and angle of the radiation beam. *Id.* ¶ 13; *see also* Hr'g 8:6-14. There are two methods of planning radiation treatment: "forward"[10] and "inverse." Popple Decl. (SEALED) ¶ 23. "Forward" planning describes a manual "trial-and-error" approach, and is "best suited for cases in which the tumor has a simple shape and is not near any critical organs." *Id.* ¶¶ 24-25. By contrast, in "inverse" planning, a radiation oncologist "defines a patient's critical organs and target tumor and specifies the target dose and dose limitations to surrounding structures." *Id.* ¶ 26. The treatment planning system then uses

---

[9] The "intensity" of a radiation beam refers to the amount of radiation that accumulates at a specific location of the treatment portal defined by the linac. *See generally* '008 patent (ECF No. 87-1 (SEALED)) col. 5 ll.3-5.

[10] Also known as "conformal." Popple Decl. (SEALED) ¶ 24.

4

an optimization program to determine optimal treatment "fields" (i.e., beams of radiation from a particular direction). *Id.*

Prowess alleges that inverse planning treatment was historically "limit[ed]," because optimization programs did not account for specific equipment limitations, or--with respect to the IMAT mode of delivery--the velocity of the MLC leaves and gantry. Second Am. Compl. ¶ 15; *see* Popple Decl. ¶¶ 27-28. Manual reconfiguration by the individual radiologist was required to render the treatment plan deliverable. *See generally* Hr'g 9-10.

C. The '008 and '591 Patents

On January 9, 2007 and February 19, 2008, U.S. Patent Nos. 7,162,008 (the "'008 patent") and 7,333,591 (the "'591 patent") were issued to inventors Matt A. Earl, David M. Shepard, and Xingsheng (Cedric) Yu (collectively, the "inventors"). *See generally* '008 patent; '591 patent (ECF No. 87-2 (SEALED)).[11] According to Prowess, the patents "disclose[] and claim[] innovative and valuable improvements in the process of developing treatment plans using IMAT and IMRT." Second Am.

---

[11] The '008 patent is titled "Method for the Planning and Delivery of Radiation Therapy." The patent describes and claims "[a] new optimization method for generating treatment plans for radiation oncology," effective for IMRT, IMAT, and hybrid IMRT. '008 patent Abstract. The '008 patent contains 28 claims. *See* '008 patent cols. 9-14. The '591 patent is a continuation of the '008 patent and contains four claims. *See* '591 patent col. 10.

Compl. ¶¶ 18, 24; *see also* Hr'g 6:21-22. Specifically, the patents are "directed to methods and software of **directly** taking machine parameters (i.e., MLC motion speed, gantry speed, and the range of dose rates) into account." ECF No. 92 (SEALED) at 14 (bold and italic emphasis in original). This technique-- which the inventors named "direct aperture optimization" ("DAO")[12]

> requires just one step: the treatment planner simply enters in the dose prescriptions for the tumor and restrictions for surrounding structures, and the output of the inventors' patented algorithm is an aperture configuration that is **automatically** generated by the computer software, . . . which is readily deliverable.

ECF No. 92 (SEALED) at 14 (emphasis in original). The invention "allows for" the planning for IMRT, IMAT, or a "new type" of intensity-modulated radiotherapy that combines IMRT and IMAT. '008 patent col. 2 l.67 to col. 3 l.3. "Hybrid IMRT" "provides the ability to incorporate into each treatment plan the dosimetric advantages of both IMRT and IMAT." *Id.* col. 3 ll.4-6.

The '008 and '591 patents were assigned to the University of Maryland ("UMD") and exclusively licensed to Prowess. *E.g.*, Hr'g 6:15-20.

---

[12] *See, e.g.*, '008 patent col. 6, ll.4-22.

D. Procedural History

On May 18, 2011, Prowess filed suit for patent infringement against Nucletron, RaySearch, and Philips Healthcare Informatics, Inc. ECF No. 1. On June 3, 2011, Prowess amended the complaint to add Philips as a defendant. ECF No. 5. On August 19 and 22, 2011, the Defendants answered the amended complaint and counterclaimed. ECF Nos. 13, 14, 17. On September 8, 2011, Prowess answered. ECF Nos. 29-31.

On March 15, 2012, Prowess filed a second amended complaint alleging that RaySearch "has been and is offering" certain software[13] that employs algorithms which infringe upon "most, if not all" of the '008 and '591 patent claims. Second Am. Compl. ¶¶ 19, 25. Prowess further alleged that RaySearch has contributed to infringement of the patents by providing the SmartArc module to radiation therapy equipment manufacturers like Nucletron and Philips. *Id.* Prowess alleged that Nucletron and Philips are infringing the patents by selling radiation therapy equipment that "includes and employs" RaySearch's software. *Id.* ¶¶ 20, 26. Finally, Prowess alleged that the Defendants willfully infringed the patents by "continuing their acts of infringement after having been provided notice of the

---

[13] The "'SmartArc' module." Second Am. Compl. ¶ 19.

7

Patent by Prowess." *Id.* ¶¶ 21, 27.[14] On April 4, 2012, the
Defendants answered and counterclaimed, seeking declarations of
noninfringement and patent invalidity. ECF Nos. 66-68. On
April 30, 2012, Prowess answered. ECF Nos. 70-72.

On September 7, 2012, the parties filed a Joint Claim
Construction Statement. ECF No. 91 (SEALED).[15] Also on
September 7, the parties filed their respective opening claim
construction briefs (individually, "opening brief"). ECF Nos.
87 (SEALED), 92 (SEALED). On October 12, 2012, the parties
filed their respective responsive claim construction briefs
(individually, "responsive brief"). ECF Nos. 105 (SEALED), 106
(SEALED). On October 22, 2012, Prowess moved to strike the

---

[14] Prowess alleged two counts of patent infringement against the
Defendants and sought: (1) entry of judgment in favor of Prowess
and against the Defendants; (2) damages "adequate to compensate
Prowess for the infringement that has occurred," with pre-
judgment interest and no less than a "reasonable royalty" under
35 U.S.C. § 284; (3) a finding that the Defendants' infringe-
ment was willful, warranting increased damages and attorney's
fees under 35 U.S.C. §§ 284 and 285; (4) a preliminary and
permanent injunction prohibiting the Defendants from further
"infringement, inducement, and/or contributory infringement";
and (5) "such other relief that this Court deems just and
proper." Second Am. Compl. at 7-8.

[15] In compliance with the scheduling order, ECF No. 43 at 8
(I.C.11(b)), the parties presented agreed-upon and disputed
constructions of terms and claims, and identified witnesses
expected to testify at the claim construction hearing. *See
generally* ECF No. 91 (SEALED). All parties reserved the right
to "amend or supplement" their claim constructions--and evidence
in support of those constructions--based on expert opinions,
ongoing discovery, or an opposing party's proposed
constructions. ECF No. 91-1 (SEALED) at 2 nn.1, 3; ECF No. 91-2
(SEALED) at 2 nn.1, 3.

8

Defendants' responsive brief and requested an expedited briefing schedule. ECF No. 114 (SEALED).[16] On November 5, 2012, the Defendants opposed the motion to strike. ECF No. 116. On November 15, 2012, Prowess replied. ECF No. 121.

On November 30, 2012, the Defendants moved for leave to file amended answers and defenses to the second amended complaint, and counterclaims. ECF Nos. 126, 127 (SEALED). On December 13, 2012, the Court denied Prowess's motion to strike the Defendants' responsive brief on claim construction. ECF Nos. 146 (SEALED), 147 (SEALED). On December 14, 2012, the Court held a claim construction hearing. ECF No. 148. On December 17, 2012, the Defendants moved to supplement the record in support of their opening brief. ECF No. 149. Also on December 17, Prowess opposed the Defendants' motion for leave to file amended answers. ECF No. 151 (SEALED). On January 7, 2013, the Defendants replied. ECF No. 164 (SEALED). That day, Prowess opposed the Defendants' motion to supplement the record. ECF No. 168 (SEALED). On January 24, 2013, the Defendants replied. ECF No. 179 (SEALED).

II. The Defendants' Motions

Before reaching the merits of the claim construction issues, the Court will address the Defendants' pending motions.

---

[16] The request for expedited briefing was denied. *See* ECF No. 115.

A. Motion for Leave to File Amended Answers and Defenses to the Second Amended Complaint, and Counterclaims

The Defendants seek leave to file amended answers to the second amended complaint, and counterclaims, on the grounds that they have "recently learned of facts" that support adding as affirmative defenses and counterclaims inequitable conduct, unclean hands, and infectious unenforceability. *See* ECF No. 126 at 1. *See generally* ECF Nos. 126-4, 126-5, 126-6. Prowess contends that the Defendants' motion "fail[s] to satisfy" the Federal Circuit's "heightened" standard for proving inequitable conduct, and the Defendants' other amendments--which are "based entirely" on the inequitable conduct allegations--should be rejected for the same reason. *See* ECF No. 151 (SEALED) at 1 n.1, 2-3. Prowess further argues that the Defendants' evidence of inequitable conduct is insufficient "as a matter of law," rendering amendment futile. *Id.* at 3.

The Federal Rules of Civil Procedure create "tension" over the standard applicable to motions to amend pleadings[17] when a scheduling order sets a deadline for amendment.[18] Specifically, Rule 15(a)(2) instructs the Court to "freely give leave [to amend a pleading] when justice so requires"; under the Rule, a motion to amend should be denied only when "the amendment would

---

[17] An answer is a pleading. Fed. R. Civ. P. 7(a)(2).

[18] *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008).

be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile."[19] On the other hand, Rule 16(b) requires the Court to issue a scheduling order that "limit[s] the time to join other parties, amend the pleadings, complete discovery, and file motions." Fed. R. Civ. P. 16(b)(1), (3)(A). The schedule "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Although the interplay between these rules is unclear, the Fourth Circuit has clarified that a party must first demonstrate good cause to modify scheduling order deadlines, *before also satisfying* the Rule 15(a)(2) standard for amendment.[20]

Here, the November 16, 2011 scheduling order required motions for amendment of pleadings to be filed within 60 days.

---

[19] *HCMF Corp. v. Allen*, 238 F.3d 273, 276 (4th Cir. 2001) (internal quotation marks omitted); *see also Sanders v. Mosaic Co.*, 418 F. App'x 914, 918 (Fed. Cir. 2011) ("A motion to amend a pleading is a procedural matter governed by the law of the regional circuit.").

[20] *Cook v. Howard*, 484 F. App'x 805, 814-15 (4th Cir. 2012) (per curiam); *see Nourison Rug*, 535 F.3d at 298 ("[A]fter the deadlines provided by a scheduling order have passed, the good cause standard must be satisfied to justify leave to amend the pleadings."); *id.* at 299 ("We refuse" to "read[] Rule 16(b) in light of Rule 15(a)'s liberal allowances."); *see also, e.g., Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 716 (8th Cir. 2008) ("[T]o permit district courts to consider motions to amend pleadings under Rule 15(a) without regard to Rule 16(b) would render scheduling orders meaningless and effectively . . . read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure." (internal quotation marks omitted)).

ECF No. 43 (I.A.6). On February 28, 2012, the Court granted the parties' joint motion for leave to extend all deadlines by 30 days. ECF No. 58. The scheduling order was modified for the third time on March 22, 2012. ECF No. 65. The amended order required Prowess to file and serve a second amended complaint on March 21, 2012, and required the Defendants to answer the second amended complaint by April 4, 2012. *Id.* at 1. The order further provided that, "[a]ll unamended portions of the Scheduling Order . . . remain in full effect." *Id.* at 3.[21]

Accordingly, the deadline for motions to amend remained 90 days after entry of the initial scheduling order, or February 14, 2012. The Defendants' motion was filed more than nine months later, on November 30, 2012. ECF No. 126. Thus, the motion may be granted only if the Defendants have--as an initial matter--shown good cause. *Nourison*, 535 F.3d at 298; *see also Cook*, 484 F. App'x at 814-15.

Rule 16(b) good cause exists when, *inter alia*, a party "uncover[s] previously unknown facts during discovery that would support an additional cause of action." *Forstmann v. Culp*, 114 F.R.D. 83, 86 n.1 (M.D.N.C. 1987) (*quoted and cited in In re Lone Star Indus., Inc. Concrete R.R. Cross Ties Litig.*, 19 F.3d 1429 (Table), 1994 WL 118475, at *11 (4th Cir. 1994)).

---

[21] Further amendments to the scheduling order have occurred, but are not relevant to the Defendants' pending motion. *See* ECF Nos. 78, 84, 102, 137, 241.

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011) (en banc).[22] "Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [PTO], which includes a duty to disclose . . . all information known to that individual to be material to patentability . . . ."[23] "A patent applicant's duty to disclose is not limited to disclosing prior art. A patent applicant must disclose any material information to the PTO." *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1258 (Fed. Cir. 1997).

"To establish unenforceability based on inequitable conduct in the PTO, it must be shown that information material to patentability was withheld from the PTO, or material misinformation was provided to the PTO, with the intent to deceive or mislead the patent examiner into granting the patent."[24] Allegations of inequitable conduct must be pled with

---

[22] The Federal Circuit has characterized the defense as the "atomic bomb of patent law." *Therasense*, 649 F.3d at 1288.

[23] 37 C.F.R. § 1.56(a); *see also Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 999 (Fed. Cir. 2007).

[24] *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1290 (Fed. Cir. 2012).

particularity. Fed R. Civ. P. 9(b);[25] *see Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1318 (Fed. Cir. 2009).

"Whether inequitable conduct has been pleaded with particularity under Rule 9(b) is a question governed by Federal Circuit law." *Exergen*, 575 F.3d at 1318. "[I]n pleading inequitable conduct in patent cases, Rule 9(b) requires identification of the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Id.* at 1327. The pleading "must [also] include sufficient allegations of underlying facts from which a court may *reasonably infer* that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, *and* (2) withheld or misrepresented this information with a specific intent to deceive the PTO." *Id.* at 1328-29 (emphases added). "A reasonable inference is one that is plausible and that flows logically from the facts alleged, including . . . objective indications of candor and good faith." *Id.* at 1329 n.5.

The Defendants argue that the proposed amended answers adequately plead inequitable conduct in "over [50] paragraphs of specific details describing multiple material references and

---

[25] Rule 9(b) provides that, in alleging fraud or mistake, a party "must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

14

prior disclosures of the invention that were . . . withheld from the PTO." ECF No. 127 (SEALED) at 6 (*citing* ECF Nos. 126-1 to -3, ¶¶ 10-62). The Defendants further argue that the answers "provide enough details regarding the materiality of the references and prior disclosures to enable a court to reasonably infer that the withholding parties acted with the requisite state of mind." *Id.* Prowess contends that the Defendants' motion ignores the "new, strict evidentiary standards" for proving inequitable conduct set forth in *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc). ECF No. 151 (SEALED) at 2.[26] Prowess further argues that

---

[26] Almost two years after deciding *Exergen*, the Federal Circuit held in *Therasense* that, to prevail on a claim of inequitable conduct, an accused infringer must prove--by clear and convincing evidence--that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO. 649 F.3d at 1287. *Therasense* further held that the materiality required to establish inequitable conduct is "but-for" materiality. *Id.* at 1291. Prior art is but-for material if the PTO "would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* With respect to the intent to deceive, the specific intent must be "*the single most reasonable inference* able to be drawn from the evidence." *Id.* at 1290 (emphasis added). "In other words, the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Id.*

*Therasense* generated a split among district courts about the effect--if any--of its holding on *Exergen*'s pleading requirements. *Cutsforth, Inc. v. LEMM Liquidating Co.*, No. 12-cv-1200 (SRN/JSM), 2013 WL 2455979, at *4 n.9 (D. Minn. June 6, 2013) (collecting cases). The Federal Circuit resolved this uncertainty in *Delano Farms Co. v. California Table Grape Commission*, 655 F.3d 1337 (Fed. Cir. 2011), which held that, to survive a motion to dismiss, an inequitable conduct counterclaim

15

the Defendants have failed to plead inequitable conduct with particularity, and amendment would be futile. *Id.* at 2-3, 6.

As a preliminary matter, the issue before the Court is whether the Defendants have pled--not proven--inequitable conduct. *See Delano Farms*, 655 F.3d at 1350; *Therasense*, 649 F.3d at 1285 (addressing appeal from district court's award of summary judgment due to inequitable conduct); *Pfizer Inc. v. Teva Pharm. USA, Inc.*, 803 F. Supp. 2d 409, 432 (E.D. Va. 2011) ("[A]t the pleading stage[,] a party is not required to meet the clear and convincing evidence standard that applies on the merits."). However, the Court also recognizes its duty after *Therasense* to "take an active role in examining the propriety of inequitable conduct claims"--a function that "cannot [be] perform[ed]" without "incorporating allegations of the specific elements to be proven on the merits at the pleading stage, albeit at a lower standard of plausibility." *Teva Pharm. USA*, 803 F. Supp. 2d at 432.

Here, the Defendants seek leave to allege two bases of inequitable conduct in prosecution of the '008 and '591 patents: withholding of references, and withholding of prior "disclosures" of the claimed invention that would anticipate the patent

need only recite facts "from which the court may reasonably infer that a specific individual both knew of invalidating information that was withheld from the [PTO] and withheld that information with a specific intent to deceive the [PTO]." *Id.* at 1350.

claims. *See generally* ECF No. 126-1, Countercls. ¶¶ 10-61 [hereinafter, "Countercls."][27] The Court will address each in turn.

1. Withheld References

The Defendants allege that the '008 and '591 patents' inventors--Earl, Shepard, and Yu--withheld four publications from the PTO during the patents' prosecution: (1) J. Tervo & P. Kolmonen, *A Model for the Control of a Multileaf Collimator in Radiation Therapy Treatment Planning*, 16 Inverse Problems 1875 (2000) ("Tervo"); (2) Werner De Gersem et al., *Leaf Position Optimization for Step-and-Shoot IMRT*, 51 Int'l J. Radiation Oncology 1372 (2001) ("De Gersem"); (3) Paul S. Cho & Robert J. Marks II, *Hardware-Sensitive Optimization for Intensity Modulated Radiotherapy*, 45 Physics Med. & Biology 429 (2000) ("Cho & Marks"); and (4) Johan Löf, *Development of a General Framework for Optimization of Radiation Therapy*, Stockholm (2000) (the "Löf thesis") (collectively, the "withheld references"). Countercls. ¶¶ 11-14. The Defendants assert that they did not learn of this alleged misconduct until the inventors' October and November 2012 depositions. *See generally* ECF No. 127 (SEALED) at 2-3.

---

[27] The Defendants' proposed amendments are substantively identical. *See* ECF Nos. 126-1 to -3. For the sake of brevity, this memorandum opinion will refer exclusively to RaySearch's (ECF No. 126-1).

17

a. Materiality

The Defendants allege that the withheld references are "but-for material" to the patentability of "the claims of the '008 and '591 patents" because--like the patents--the references are "related to" the optimization of radiation treatment plans wherein the constraints of the machine are directly considered. Countercls. ¶¶ 21, 26, 33. The Defendants further allege that the withheld references "directly contradict" statements made to the PTO during prosecution of the '008 patent, in that "[i]t was repeatedly argued" to the Office that prior art did *not* disclose one-step optimization. *Id.* ¶¶ 21, 28; *see also id.* ¶¶ 29-33. The Defendants conclude that the PTO "would not have allowed the claims of" either patent had it been aware of these withheld references. *E.g.*, *id.* ¶¶ 24, 26.

As discussed above, Rule 9(b) requires allegations of inequitable conduct to include "identification of the specific who, what, when, where, and how" of the material omission committed before the PTO. *Exergen*, 575 F.3d at 1327. To satisfy the first element, the pleading must name the person who knew of the material information and deliberately withheld or misrepresented it. *See id.* at 1329. To plead the "what" and "where" of the material omissions, the pleading must identify "which claims, and which limitations in those claims, the withheld references are relevant to, and where in those

18

references the material information is found." *Id.*[28] To allege "why" the withheld information was material and not cumulative-- and "how" an examiner would have used the information in assessing patentability--the pleading must also indicate "the particular claim limitations, or combination of claim limitations," that are supposedly absent from the information of record. *Id.*[29] Factual deficiency as to any of the above elements is "fatal under Rule 9(b)." *Id.* at 1330.

Assuming that the withheld disclosures are prior art,[30] the Defendants have not identified which patent claims the references are relevant to, or which claim limitations are absent from the information of record. *Cf. Exergen*, 575 F.3d at

---

[28] *See Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1570 (Fed. Cir. 1997) ("Information is material if a reasonable examiner would have considered it important to the patentability of a *claim*." (emphasis added)); *see also* 37 C.F.R. § 1.56(a) ("The duty to disclose information exists with respect to each pending *claim* until the *claim* is cancelled or withdrawn from consideration, or the application becomes abandoned." (emphases added)).

[29] *See Larson Mfg. Co. v. Aluminart Prods. Ltd.*, 559 F.3d 1317, 1333 (Fed. Cir. 2009) (finding information cumulative to art of record that taught the "same combination" of claim limitations taught in withheld reference).

[30] "Prior art" is defined as "[k]knowledge that is publicly known, used by others, or available on the date of invention to a person of ordinary skill in an art, including what would be obvious from that knowledge." *Black's Law Dictionary* 126 (9th ed. 2009). Prowess's opposition to the motion for leave to amend "reserves the right and does not waive any argument" that the withheld references do not qualify as prior art. ECF No. 151 (SEALED) at 8 n.2.

19

1329.[31]  Further, that the withheld references arguably

"contradict" statements made during prosecution of the `008

patent, *see* Countercls. ¶¶ 21, 28-33, does not salvage the

Defendants' motion.  In support of this argument, the Defendants

cite sections of the Manual of Patent Examining Procedures (the

"MPEP") regarding the duty to disclose information material to

patentability,[32] as well as 37 C.F.R. § 1.56[33] (Rule 56).  *E.g.*,

Countercls. ¶ 10.  But the MPEP is not binding on this Court,[34]

---

[31] The Defendants contend that they have satisfied Rule 9(b)'s
requirements, as interpreted in *Exergen*, by "stating that the
withheld references are material to the patentability of *all
claims* of the asserted patents."  ECF No. 164 (SEALED) at 7
(emphasis added).  However, *Exergen* expressly requires a higher
level of specificity--even at the pleading stage--for
allegations of inequitable conduct.

     The Defendants note that, "[t]o the extent that the Court
concludes that a claim-by-claim analysis is required," they
attached to their reply brief the invalidity charts provided to
Prowess as part of the Defendants' Initial Disclosure of
Invalidity Contentions.  ECF No. 164 (SEALED) at 7 n.4.  To the
extent the Defendants are capable of adequately pleading
inequitable conduct, it is their burden to file a proposed
amended complaint that does so.  The Court will not write
additional allegations into the amended pleading before it.

[32] MPEP §§ 2001.04, 2001.05, 2001.06(b).  Countercls. ¶ 10.

[33] Under the Rule, information is material to patentability when
it is not cumulative to information of record, and it
     refutes, or is inconsistent with, a position the
     applicant takes in:
     (i) Opposing an argument of unpatentability relied on
     by the Office, or
     (ii) Asserting an argument of patentability.
37 C.F.R. § 1.56(b).

[34] *E.g.*, *In re Hubbell*, 709 F.3d 1140, 1146 (Fed. Cir. 2013); *see
also Foreword*, USPTO.gov (Sept. 13, 2012, 5:28 PM), http://www.

and the Federal Circuit has expressly declined to adopt Rule 56 as a definition for inequitable conduct. *See Therasense*, 649 F.3d at 1295 ("Because Rule 56 sets such a low bar for materiality, adopting this standard would inevitably result in patent prosecutors continuing the existing practice of disclosing too much prior art of marginal relevance and patent litigators continuing to charge inequitable conduct in nearly every case as a litigation strategy.").

Thus, the Defendants have failed to plausibly allege, with particularity, that the withheld references are material. Their motion fails for this reason alone. *Exergen*, 575 F.3d at 1330.

b. Knowledge and Intent

In addition to showing materiality, the pleading "must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) *knew* of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information *with a specific intent* to deceive the PTO." *Exergen*, 575 F.3d at 1328-29 (emphases added).

The Defendants allege that the inventors "knew of" Tervo and De Gersem "at least as early as September 26, 2001," as they cited the publications in an article they coauthored that was

uspto.gov/web/offices/pac/mpep/mpep-0015-foreword.html ("The Manual does not have the force of law or the force of the rules in Title 37 of the Code of Federal Regulations.").

received for publication on that date;[35] the inventors "knew of" Cho & Marks by February 4, 2003, as they cited the publication in an article "created" for an American Association of Physicists in Medicine ("AAPM") summer program (the "Summer School Paper")[36]; and "at least" Shepard and Yu "knew of" the Löf thesis at some time "before the issuance of the '008 and '591 patents." Countercls. ¶¶ 15-17.[37] The '008 patent application was filed on December 3, 2002; the '591 patent application was filed on October 27, 2006. *See generally* '008 and '591 patents.

    In addition to alleging prior knowledge of the existence of the withheld references, the Defendants allege that the inventors knew the references contained material information.

---

[35] D.M. Shepard et al., *Direct Aperture Optimization: A Turnkey Solution for Step-and-Shoot IMRT*, 29 Med. Physics 1007 (2002) (the "Turnkey article"). Countercls. ¶ 15. At his November 28, 2012 deposition, Shepard stated that he had referenced De Gersem because of its relevance "in the field." ECF No. 127 (SEALED), Ex. 8 (SEALED) 110:22 to 111:4.

    At his October 22, 2012 deposition, Yu admitted to having read De Gersem in 2001. ECF No. 127 (SEALED), Ex. 4 (SEALED) 67:13-18.

[36] D.M. Shepard et al., *Aperture-Based Inverse Planning*. Countercls. ¶ 16.

[37] "Upon information and belief," Shepard "saw" the Löf thesis soon after the Turnkey article was published. Countercls. ¶ 17. Upon information and belief, Shepard also read two white papers describing the accused technology "around the time" the '008 and '591 patents were published in 2003 and 2004, respectively. *Id.* (*citing* Björn Hårdemark et al., *Direct Machine Parameter Optimization with RayMachine in Pinnacle$^3$*, RaySearch White Paper (2003); Björn Hårdemark et al., *P$^3$IMRT Direct Machine Parameter Optimization*, Pinnacle$^3$ White Paper (2004) (together, "White Papers"). *Id.* The White Papers cite the Löf thesis. *Id.*

Specifically, the Defendants allege that the inventors "knew" Tervo and De Gersem were material to the patentability of the '008 and '591 patent claims, because the 2002 Turnkey article referenced Tervo and De Gersem in addition to T. Bortfeld et al., *X-Ray Compensation with Multileaf Collimators*, 28 Int'l J. Radiation Oncology 713 (1994) ("Bortfeld"), but only disclosed the latter to the PTO. Countercls. ¶¶ 22-24.[38] The Defendants also allege that the Summer School Paper evidences knowledge of materiality as to Cho & Marks, because page 3 of the Summer School Paper cited Cho & Marks in noting that, "[b]ecause the leaf-sequencing is constrained by the delivery hardware, a large number of complex field shapes are often needed," which could "lead to a loss in efficiency and an increase in collimator artifacts." *Id.* ¶ 25. Finally, "[a]t least" Shepard and Yu knew the Löf thesis was material, because the Löf thesis was cited as the first reference in the White Papers describing the technology at issue here (direct machine parameter optimization). *Id.* ¶ 27.

The Court will assume, for purposes of this analysis, that the Defendants have adequately alleged the inventors' knowledge

---

[38] Bortfeld was cited in the Turnkey article's general description of prior art techniques; Tervo and De Gersem were cited as examples of previous research and publications on methods for eliminating the necessity of separate instrument fitting in optimization of radiation treatment plans. Countercls. ¶¶ 22-23.

of the withheld material information. Without elaboration, the
Defendants assert that "the only reasonable inference" to be
drawn from the above facts[39] is that the references were withheld
"with the specific intent to deceive the [PTO]." Countercls. ¶¶
34, 36, 38, 40.[40]  However, "[t]he mere fact that an applicant
disclosed a reference during prosecution of one application, but
did not disclose it during prosecution of a related application,
is insufficient to meet the threshold level of deceptive intent
required to support an allegation of inequitable conduct." 575
F.3d at 1331. It follows, then, that the mere fact that an
inventor cited a reference in a publication predating a patent,
but did not disclose the reference as prior art regarding the
patent, is insufficient to show that the inventor acted with the
specific intent to deceive. Certainly, no facts suggest that
the specific intent to deceive is "the single most reasonable

---

[39] E.g., that the inventors disclosed Bortfeld but not Tervo, and
patentability of the '008 patent claims was "repeatedly" argued
based on the representation that prior art did not consider
machine parameters during optimization, despite the inventors'
awareness that it did. Countercls. ¶¶ 34-37, 39.

[40] *See also* ECF No. 164 (SEALED) at 8 (arguing that the
inventors' citation of the withheld references--except the Löf
thesis--is "enough to show a reasonable inference of deceptive
intent").

24

inference" to be drawn from the facts alleged. *See Therasense*, 649 F.3d at 1290.[41]

## 2. Prior "Disclosures" of the Claimed Invention that Would Anticipate the Patents

The Defendants allege that Yu "disclosed the claimed invention"[42] to Elekta "several times" before the '008 and '591 patent applications were filed, including at an IMRT Consortium in "April or May" 1999 and during a July 21, 1999 presentation (the "1999 Elekta disclosures"). Countercls. ¶ 41. Yu--acting alone "or" with Shepard--also "disclosed the claimed invention" to Philips and Elekta employees, including Doctor Todd McNutt, at ASTRO and AAPM Annual Meetings in "either 2000 or 2001" (the "2000/2001 Philips and Elekta disclosures"). *Id.* ¶¶ 46, 50. Yu and Shepard "disclosed the claimed invention" to Nucletron employees Jaap Pijpelink and Kate Driggers during a September 13, 2001 presentation at the University of Maryland (the "2001 Nucletron disclosures"). *Id.* ¶ 54. Finally, "[u]pon information or belief," Yu--alone "or" with Doctor Sarfaraz--"disclosed the claimed invention" to Dean Renner, the owner of Math Resolu-

---

[41] Prowess has submitted evidence that, during the peer-to-peer review process of the Turnkey article, the inventors recognized (and shared) significant differences between their optimization approach and the approaches discussed in De Gersem and Tervo. *See* ECF No. 151-2 (SEALED) at 3-4.

[42] I.e., using DAO to "plan for" fixed-field, arc, and a combination of fixed-field and arc delivery. Countercls. ¶ 42.

tions, sometime "before the patent applications . . . were filed" (the "Math Resolutions disclosures"). *Id.* ¶ 58.

  a. Materiality

The Defendants allege that the above disclosures of "the claimed invention" are "but-for material" to the patentability of "the '008 and '591 patents"[43] because they were not the subject of any nondisclosure or confidentiality agreements and would anticipate the claims of the patents for purposes of 35 U.S.C. § 102(a).[44]  Countercls. ¶¶ 43-44, 47-48, 51-52, 55-56, 59-60.

---

[43] These allegations are upon information or belief as to the Math Resolutions disclosures. Countercls. ¶¶ 59-60. "Pleading on 'information and belief' is permitted under Rule 9(b) when essential information lies uniquely within another party's control, but only if the pleading sets forth the specific facts upon which the belief is reasonably based." *Exergen*, 575 F.3d at 1330.

[44] Before September 16, 2011, 35 U.S.C. § 102(a) provided that a person "shall be entitled to a patent" *unless* "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent." On September 16, 2011, the section was rewritten to provide that a person is entitled to a patent unless, *inter alia*, "the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." Pub. L. No. 112-29, § 3(b)(1), 125 Stat. 284, 286. No party has addressed the amended statute, which does not appear to apply here. *See* Pub. L. No. 112-29, § 3(n) ("Except as otherwise provided in this section, the amendments made by this section shall take effect upon the expiration of the 18-month period beginning on the date of the enactment of this Act . . .").

Under 35 U.S.C. § 102(a), a person shall be entitled to a patent unless, *inter alia*, the invention was "known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent." 35 U.S.C. § 102(a)(1); *see also supra* note 44. To be anticipatory, a single prior art reference must "expressly or inherently disclose each claim limitation." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1334 (Fed. Cir. 2008). Anticipation further requires the presence of "all elements of a claimed invention *arranged as in the claim.*" *Id.* at 1334-35. "[T]he dispositive question regarding anticipation [is] whether one skilled in the art would reasonably understand or infer from a [prior art reference]" that every claim element is disclosed in that reference. *In re Baxter Travenol Labs.*, 952 F.2d 388, 390 (Fed. Cir. 1991).

Here, the Defendants have failed to allege the form--let alone the content--of the information allegedly disclosed by the inventors to Elekta, Philips, and Nucletron employees between 1999 and 2001. *See generally* Countercls. ¶¶ ¶¶ 41, 46, 50, 54, 58. The Defendants' conclusionary statement that the disclosures "anticipate[d] the claims of the patents"[45] does not suffice, for "[a] pleading that simply avers the substantive elements of inequitable conduct, without setting forth the

---

[45] Countercls. ¶¶ 43, 47, 51, 55, 59.

particularized factual bases for the allegation, does not
satisfy Rule 9(b)." *Exergen*, 575 F.3d at 1326-27. Without any
specific factual allegations as to what was said or shared, this
Court cannot reasonably infer that the disclosures are but-for
material because they anticipated the patents in suit.

b. Knowledge and Intent

Without elaboration, the Defendants assert that "the only
reasonable inference" to be drawn from the above facts is that
the inventors did not disclose to the PTO the 1999 Elekta
disclosures, the 2000/2001 Philips and Elekta disclosures, the
2001 Nucletron disclosures, or the Math Resolutions disclosures
to "deceive the [PTO]." Countercls. ¶¶ 45, 49, 53, 57, 61. As
discussed above, the Defendants' conclusionary assertion that
the inventors intended to deceive the PTO is insufficient under
Rule 9(b).

Contrary to Prowess's suggestion,[46] the Defendants need not
prove--at this stage in the proceedings--that inequitable
conduct occurred. However, the Defendants must satisfy their
burden of pleading, with particularity, the who, what, when,
where, and how of the alleged misconduct, as well as facts from
which this Court could infer that the inventor(s) who allegedly
withheld or misrepresented the relevant information did so
knowingly and with the specific intent to deceive. *See*

---

[46] *E.g.*, ECF No. 151 (SEALED) at 8.

*generally Exergen*, 575 F.3d at 1327-29. The Defendants have failed to carry this burden. Accordingly, they have not shown good cause to amend the scheduling order. *See* Fed. R. Civ. P. 16(b)(4); *Cook*, 484 F. App'x at 814-15; *Forstmann*, 114 F.R.D. at 86 n.1.[47] Their motion for leave to amend will be denied.[48]

B. Motion to Supplement the Record in Support of Opening Brief

The Defendants move to supplement the record in support of their opening claim construction brief to include a PowerPoint presentation (the "PowerPoint")[49] produced by counsel for Shepard

---

[47] The Court need not consider Prowess's alternative arguments-- under Fed. R. Civ. P. 15(a)(2)--that amendment would be futile and prejudicial, and the motion resulted from the Defendants' lack of diligence and was in bad faith. ECF No. 151 (SEALED) at 3-5, 19-21.

[48] In addition to inequitable conduct, the Defendants' proposed answer sought to add as affirmative defenses and counterclaims unclean hands and infectious unenforceability. *See generally* ECF No. 126-1. The Defendants offer no additional facts to support a claim for unclean hands, and the claim for infectious unenforceability derives, necessarily, from the inequitable conduct allegations. *See, e.g.*, Countercls. ¶ 62 (alleging that the '591 patent is unenforceable under the doctrine of infectious unenforceability because of inequitable conduct during the prosecution of the '008 patent, of which it is a continuation). Accordingly, these claims also fail.

[49] The 54-page PowerPoint is entitled "Method for the Planning and Delivery of Radiation Therapy," and is attached as Exhibit A to the Defendants' motion. *See* ECF No. 149-2. Shepard and Earl are listed as coauthors. *Id*. The PowerPoint includes four topics, including a summary of the DAO technique and a discussion distinguishing related patent No. 5,596,619 (the "Carol patent") from the inventors' proposed method. *See id*. at 29-55. The PowerPoint was not publicly available, nor was it added to the '008 and '591 patents' respective prosecution histories. ECF No. 168 (SEALED) ¶ 13; *id*., Exs. 3, 4.

and Prowess during Shepard's November 28, 2012 deposition. *See generally* ECF Nos. 149, 149-1. The Defendants argue that supplementation is appropriate because Prowess--which had control over the PowerPoint through its representation of Shepard--would not be prejudiced by the document's addition to the record, and because the PowerPoint--which was presented to the PTO examiner during prosecution of the '008 patent--is relevant to claim construction. ECF No. 149-1 ¶ 10. Prowess objects that the motion is "untimely and improper," and "will only serve to delay judicial proceedings and prejudice Prowess." ECF No. 168 (SEALED) at 1-2.

When ruling on a motion to supplement, courts should consider the harm, if any, that would result from supplementation, and whether the proposed evidence "enhances the Court's truth-finding function." *StemCells, Inc. v. Neuralstem, Inc.*, Nos. 8:06-cv-01877-AW, 8:08-cv-02664-AW, 8:08-cv-01173-AW, 2012 WL 1184545, at *8 (D. Md. Apr. 6, 2012).[50]

---

[50] Prowess contends that the Defendants' motion is governed by Local Rule 805.1 ("Cases Involving Claims of Infringement"), which provides that "[a]mendment of a Claims Chart or a Responsive Claims Chart may be made only on stipulation of all parties or by Order of the Court, which shall be entered only upon a showing of excusable subsequent discovery of new information or extraordinary good cause." Local Rule 805.1(e) (D. Md. 2011); *see* ECF No. 168 (SEALED) at 5-6. Prowess also cites Federal Rule of Civil Procedure 16(b)(4), which, as discussed above, provides that a scheduling order may be modified only for good cause. ECF No. 168 (SEALED) at 6. Because the Defendants do not seek to amend any claims chart,

Shepard was first made available for deposition on November 28, 2012. ECF No. 149-1 ¶ 6. The PowerPoint was produced during the afternoon session. *Id.*[51] At the deposition, Shepard testified about the origins and purpose of the PowerPoint, *id.* ¶ 7:

> Q: You have been handed, Dr. Shepard, Exhibit Number 25, which bears the Bates stamp number SHEP876 through 929. This was provided to us a short while ago today during the deposition. Do you recognize this?
> A: Yes.
> Q: And this is what you presented to the U.S. PTO at one of your meetings with the examiner, isn't that correct?
> A: I believe that's correct, yes.
> Q: And this is something that was prepared by you or under your supervision?
> A: Yes.
> Q: And what was your purpose in preparing this?
> A: If my recollection is correct about this, specifically, file, I don't know if this is exactly the presentation but it's certainly close to the presentation that was given to--after the objections that were raised about the Carol patent, we met with the patent office, described to the representative--
> Q: The examiner?
> A: --examiner, what our patent was about and how it's differentiated from the Carol patent.
> Q: Okay. And was--are the statements that you've made in this document true and accurate to the best of your

---

and no deadlines in the scheduling order are modified by the Defendants' motion, neither rule applies.

[51] According to Prowess, Shepard "located" the PowerPoint--after producing a "substantial" number of other documents pursuant to subpoena about two weeks earlier--"close to" 5:00 p.m. on November 27, 2012. ECF No. 168 (SEALED) ¶¶ 3-4; *id.*, Ex. 1. Shepard provided the document to his counsel, who is also counsel for Prowess. *Id.* ¶ 4. On November 28, 2012, counsel for Prowess processed, Bates-stamped, and produced the PowerPoint during Shepard's deposition. *Id.* ¶ 5.

belief?
            A: Yes.  Sorry.  Yes.
            Q: Okay.

ECF No. 168 (SEALED), Ex. 6 221:22 to 223:1-7.  During the

January 3, 2013 deposition of UMD's outside counsel Susan Pan,

who prosecuted the '008 and '591 patents before the PTO, Pan

testified that she could not recall whether the PowerPoint had

been given to the examiner:

        Q. Ms. Pan, I have handed you what's marked as Pan
        Exhibit 16 which David Shepard testified was the power
        point presentation made to the USPTO on October 6,
        2005.  Feel free to take a look at it and then tell me
        if you recognize it.
        A. I can't say that it's ringing any bells in my mind.
        Q. We're going to proceed under the assumption that
        David Shepard testified accurately.
                              *  *  *
        Q. Do you know how much time the inventors spent putting
        this power point together?
        A: No.  I have no idea.
        Q. Do you know if anyone authored this power point other
        than David Shepard and Matthew Earl as is indicated on the
        first page?
        A. I wouldn't know.
        Q. Well, if you had an inkling that someone else
        participated, would you have inquired?
        A. For the power point?
        Q. Yes.
        A. You mean like if an administrative assistant helped
        them?
        Q. No.  If someone had actually authored the substance
        other than Mr. Shepard and Mr. Earl.
        A. I don't believe it would have crossed my mind.
        Q. Who made this power point presentation to the examiner?
        A. I don't recall.
        Q. Fair to assume that you have not seen this power point
        presentation before you met with the inventors the day of
        the presentation?
        A. I don't see it - it's a very long power point.  Very
        long.  And typically examiner interviews are only an hour
        or so.  So I don't know if this was what was presented at

                                    32

the examiner interview. I don't recall seeing this power
point.
Q. Well, you saw a reference in the record to the power
point, didn't you?
A. Yes. But nothing ties this to the application in any
way.
Q. You mean other than Mr. Shepard's testimony?
A. I don't know what Mr. Shepard has testified to.
Q. I'm asking you to assume that he testified he did make
this presentation.
A. Okay.
Q. So with that assumption in mind, would you have made
this presentation to the USPTO as well as Mr. Shepard?
A. I don't believe I--I don't believe I would have.

ECF No. 168 (SEALED), Ex. 7 119:19 to 121:22.

At the December 14, 2012 claim construction hearing, the
Defendants orally moved to supplement the record to include the
PowerPoint. ECF No. 149-1 ¶ 8; *see* Hr'g Tr. 81:3-5. The motion
to supplement was filed three days later. ECF No. 149. Prowess
objects to the motion on three grounds, none of which is
persuasive.

First, Prowess argues that the motion is untimely because
the PowerPoint was in the Defendants' possession for "weeks"
before the claim construction hearing, but "at no point" did the
Defendants seek a stipulation from Prowess to supplement their
claim construction evidence or move for leave to amend their
claim construction statement and chart. ECF No. 168 (SEALED) at
1; *see id.* at 6. The PowerPoint was produced to the Defendants
on November 28, 2012; the Defendants moved orally to supplement
the record to include the document just over two weeks later.

ECF No. 149-1 ¶ 6; Hr'g Tr. 81:3-5. In a case that has been
pending for more than two years, a two-week response time is
hardly dilatory.

Next, Prowess argues that the Defendants' motion should be
denied because the PowerPoint is not "intrinsic" evidence. ECF
No. 168 (SEALED) at 7-9.[52] Specifically, Prowess asserts that
Shepard "could not confirm" whether the PowerPoint is the same
document he showed to the examiner; Pan did not recall the
PowerPoint at all; and the PowerPoint was never released to the
public. *Id.* Because extrinsic evidence is "significantly less
useful" than intrinsic evidence, Prowess concludes that the
PowerPoint "is not helpful to this Court." *Id.* at 8-9. Even
assuming that the PowerPoint is not intrinsic evidence,

---

[52] "Intrinsic" evidence consists of the patent claims, the
specification, and the prosecution history in the PTO. *Phillips
v. AWH*, 415 F.3d 1303, 1316-17 (Fed. Cir. 2005) (en banc). "The
prosecution history constitutes a public record of the
patentee's representations concerning the scope and meaning of
the claims, and competitors are entitled to rely on those
representations when ascertaining the degree of lawful conduct,
such as designing around the claimed invention." *Hockerson-
Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951, 957
(Fed. Cir. 2000). Similarly, in construing claims, courts
consider the prosecution history to determine whether "the
patentee disclaimed or disavowed subject matter, narrowing the
scope of the claim terms." *ACTV, Inc. v. Walt Disney Co.*, 346
F.3d 1082, 1091 (Fed. Cir. 2003). The prosecution history
comprises the "entire record of proceedings" in the PTO,
including "all express representations made by or on behalf of
the applicant to the examiner to induce a patent grant . . .
includ[ing] . . . arguments made to convince the examiner that
the claimed invention meets the statutory requirements of
novelty, utility, and nonobviousness." *Standard Oil Co. v. Am.
Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Prowess's argument fails: extrinsic evidence is routinely useful to "show what was then old, to distinguish what was new, and to aid the court in the construction of the patent." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (internal quotation marks omitted), *aff'd*, 517 U.S. 370 (1996).

Prowess's final argument--that supplementation would be "futile" because the PowerPoint "does not show **any** disavowal of claim scope, and therefore cannot change the plain and ordinary meaning of [the disputed] terms"--is also wrong. ECF No. 168 (SEALED) at 9 (emphasis in original). Reference to the PowerPoint may ultimately be unnecessary. However, the Defendants need only show that the document may aid in the Court's truth-finding function and that consideration of the PowerPoint, to the extent it is warranted, would not prejudice Prowess. *Stemcells*, 2012 WL 1184545, at *8. The PowerPoint was written by two of the three inventors of the patents in suit, and was presented to the patent examiner during prosecution of one of those patents in support of the inventors' arguments as to DAO's novelty. *See* ECF No. 149-2 at 29-55; ECF No. 168 (SEALED), Ex. 6 221:22 to 223:1-7. Accordingly, it is--at the very least--extrinsic evidence that could be helpful to the Court. Moreover, Prowess has had access to the PowerPoint since Shepard produced it seven months ago. Thus, the possibility of prejudice to Prowess is *de minimis*.

The Defendants' motion to supplement the record will be granted.

III. Claim Construction

A. Legal Standards

1. Claim Construction Generally

Claim construction is a question of law, to be determined by the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996). Specifically, "[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."[53] Therefore, "district courts are not . . . required to construe every limitation present in a patent's asserted claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). For instance, terms that are "commonplace" or that "a juror can easily use [] in her infringement fact-finding without further direction from the court" need not be construed because they "are neither

---

[53] *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997), *cert. denied*, 522 U.S. 950 (1997).

unfamiliar to the jury, confusing to the jury, nor affected by the specification[54] or prosecution history[55]."[56]

"Although a claim is not to be construed in light of the accused device, it must inevitably be construed in the context of the accused device." *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., Inc.*, No. DKC 07-1388, 2009 WL 6898404, at *2 (D. Md. Mar. 20, 2009). "It is only *after* the claims have been *construed without reference to the accused device* that the claims, as so construed, are applied to the accused device to determine infringement." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (en banc) (emphasis in original).

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled

---

[54] The "specification" is "[t]he part of a patent application describing how an invention is made and used, the best mode of operation of the claimed invention, and the inventor's claims." *Black's Law Dictionary* 1528 (9th ed. 2009).

[55] Also termed "file wrapper," the prosecution history is "[t]he complete record of proceedings in the [PTO] from the initial application to the issued patent or trademark; specif[ically], a patent or trademark-registration application together with all documentation, correspondence, and any other record of proceedings before the PTO concerning that application." *Id.* at 704.

[56] *Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 528 F. Supp. 2d 967, 976 (N.D. Cal. 2007).

the right to exclude."[57] Thus, when construing a claim, a court should give its words their "ordinary and customary meaning" as would be understood by "a person of ordinary skill in the art in question at the time of the invention."[58]

"The claim should be read within the context of the entire patent, including the specification." *Pulse*, 2009 WL 6898404, at *2. The specification "is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term."[59] "The specification functions as a dictionary to explain the claimed subject matter and define the terms used in the claims[, but] is to be used only to interpret words or phrases of a patent claim, not to add to, or detract from, the language of the claims."[60] "In some instances, the ordinary meaning of a claim as understood by a person of skill in the art will be readily apparent from the words themselves and in those situations, general

---

[57] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted), *cert. denied*, 546 U.S. 1170 (2006).

[58] *Phillips*, 415 F.3d at 1313.

[59] *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

[60] *C.M.L. s.r.l. v. Ineco Indus. Navarra de Equipos y Comercio, S.A.*, 177 F. Supp. 2d 442, 445 (D. Md. 2001) (internal citation omitted).

38

language dictionaries may be of assistance." *Pulse*, 2009 WL
6898404, at *2 (*citing Phillips*, 415 F.3d at 1314).

"In addition to consulting the specification . . . a court
should also consider the patent's prosecution history, if it is
in evidence." *Phillips*, 415 F.3d at 1317 (internal quotation
marks omitted). "The prosecution history limits the interpreta-
tion of claim terms so as to exclude any interpretation that was
disclaimed during prosecution."[61] "Yet because the prosecution
history represents an ongoing negotiation between the PTO and
the applicant, rather than the final product of that negotia-
tion, it often lacks the clarity of the specification and thus
is less useful for claim construction purposes." *Phillips*, 415
F.3d at 1317.

"In most situations, an analysis of the intrinsic evidence
alone will resolve any ambiguity in a disputed claim term. In
such circumstances, it is improper to rely on extrinsic
evidence." *Vitronics*, 90 F.3d at 1583. However, extrinsic
evidence, including expert and inventor testimony, dictionaries,
and learned treatises,

> may be helpful to explain scientific principles, the
> meaning of technical terms, and terms of art that
> appear in the patent and prosecution history.
> Extrinsic evidence may demonstrate the state of the
> prior art at the time of the invention. It is useful
> to show what was then old, to distinguish what was

---

[61] *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576
(Fed. Cir. 1995), *cert. denied*, 516 U.S. 987 (1995).

> new, and to aid the court in the construction of the
> patent.

*Markman*, 52 F.3d 967, 980 (Fed. Cir. 1995) (internal quotation
marks omitted), *aff'd*, 517 U.S. 370 (1996). "In sum, extrinsic
evidence may be useful to the court, but it is unlikely to
result in a reliable interpretation of patent claim scope unless
considered in the context of the intrinsic evidence." *Phillips*,
415 F.3d at 1319.

2. Indefiniteness

The issue of claim indefiniteness is "inextricably
intertwined with claim construction." *Energizer Holdings, Inc.*
*v. Int'l Trade Comm'n*, 435 F.3d 1366, 1368 (Fed. Cir. 2006)
(internal quotation marks omitted). "[D]etermination of claim
indefiniteness is a legal conclusion that is drawn from the
court's performance of its duty as the construer of patent
claims." *Exxon Research & Eng'g Co. v. United States*, 265 F.3d
1371, 1376 (Fed. Cir. 2001) (internal quotation marks omitted).
The Court begins by recognizing that every patent's specifica-
tion must "conclude with one or more claims particularly
pointing out and distinctly claiming the subject matter which
the inventor . . . regards as the invention." 35 U.S.C. §
112(b). "Because the claims perform the fundamental function of
delineating the scope of the invention, the purpose of the
definiteness requirement is to ensure that the claims delineate

the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (internal citations omitted).

"In the face of an allegation of indefiniteness, general principles of claim construction apply." *Datamize*, 417 F.3d at 1348. "Only claims 'not amenable to construction' or 'insolubly ambiguous' are indefinite." *Id.* at 1347. Thus, a construed claim can be indefinite if the construction remains insolubly ambiguous, meaning that it "fails to provide sufficient clarity about the bounds of the claim to one skilled in the art." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1373 (Fed. Cir. 2011). But, a claim term may be definite even when discerning the meaning is a "formidable [task] and the conclusion may be one over which reasonable persons will disagree." *Source Search Techs., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1076 (Fed. Cir. 2009) (internal quotation marks omitted).

B. Analysis

The parties principally dispute whether the relevant claims require participation by a "user," and availability of a "hybrid" mode of planning and delivery. Because the disputed terms are interspersed throughout the claims of the '008 and

41

'591 patents,[62] the Court's analysis will proceed by term, in the order set forth in the parties' Joint Claim Construction Statement (ECF No. 91 (SEALED)). Differences in proposed constructions will be emphasized by underlining.

### 1. "radiation output"

| Claim Language | Prowess's Proposed Construction | The Defendants' Proposed Construction |
|---|---|---|
| *radiation output* | measure of the rate of radiation delivered by the linac according to the linac's constraints | measure of the rate of radiation delivered by the linac |

The term "radiation output" appears in Claim 23 of the '008 patent, which claims "[t]he medium of claim 22, wherein the limitation on operations of the linear accelerator comprise at least one of: *a radiation output*, a minimal accurate dose amount and a conveyance speed for the linear accelerator." '008 patent col. 12 11.26-29 (emphasis added).[63] The parties agree that

---

[62] The parties agree that, to the extent claim terms appear in both patents, the terms should be construed "substantially similarly." Joint Claim Constr. Statement (SEALED), Ex. B at 1 n.2. For ease of reference, the Court's discussion of the disputed terms will refer exclusively to the '008 patent specification and claims.

[63] Although the parties emphasize the appearance of "radiation output" in Claim 23, the term also appears in Claims 1, 5, 18, and 25. Claim 1 asserts, in relevant part, "[a] method for planning radiation treatment of a target area . . . said method comprising . . . calculating an altered radiation dose

radiation output refers to a "rate" of radiation,[64] which is "a measure of unit as a function of time."[65]   The parties also agree that "radiation output" refers to a "measure of the rate of radiation delivered by the linac."

The parties dispute whether the rate is delivered by the linac "according to the linac's constraints."  Prowess principally argues that the intrinsic record supports adding "according to the linac's constraints" to the construction because the claim language is "directed to a term on the operations of the linear accelerator," and one of ordinary skill in the art would "understand" that linacs "differ in their ability to dynamically adjust dose rates."  Prowess's Opening

---

distribution to the patient based on the altered aperture configuration and re-evaluating the *altered radiation output* against the objective function."  *See generally* '008 patent col. 9 (emphasis added).  Claim 5, a dependent claim, asserts "[t]he method of claim **4**, wherein the limitation on operations of the linear accelerator comprise at least one of: a *radiation output* rate . . . ."  *Id.* col. 10 ll.28-30 (italicized emphasis added). Claim 18, also a dependent claim, states "[t]he method of claim **17**, wherein the radiation source includes a linear accelerator, said method further comprising: designating a limitation on operation of the linear accelerator prior to calculating the *initial radiation output* . . . ."  *Id.* col. 11 ll.32-35 (italicized emphasis added).  Finally, claim 25 references "[a] method for planning radiation treatment of a target area . . . said method comprising . . . re-calculating the *altered radiation output*  . . . until the objective function is satisfied."  *See generally id.* col. 12 (emphasis added).

[64] Prowess's Opening Br. (SEALED) at 46.

[65] Popple Decl. (SEALED) ¶ 124.

Br. (SEALED) at 47. The Defendants contend that "[t]hose familiar with radiation treatment planning . . . understand that the user or planner can freely designate parameters, such as the radiation output, when creating a plan." Defendants' Opening Br. (SEALED) at 30.

The Defendants' construction is correct. That linacs are subject to delivery constraints is a central focus of the '008 and '591 patents. According to the '008 patent specification, prior art did not account for the delivery constraints "imposed by" the design of various components of the linac. '008 patent col. 2 ll.48-52. Its failure to do so resulted in "complex" and often "inefficient" treatment plans. *Id.* col. 2 ll.51-52. The "purpose" of the claimed invention was to "enable a single planning system to plan for different modes of IMRT delivery and to simplify the planning and delivery of IMRT." *Id.* col. 3 ll.15-17. Accordingly, the invention considers "all delivery constraints" in the process of optimizing the shapes and corresponding weights of the apertures. *Id.* col. 3 ll.20-26.[66] The output of the algorithm is a set of deliverable apertures and their weights, which are transferred to the linac's control system for delivery to the patient. *Id.* col. 3 ll.58-61.

---

[66] *See also* '008 patent col. 3 ll.49-53 ("The optimization process generally involves modifying the shape or weight of the apertures, determining if the modification violates the delivery constraints, and, finally, accepting and rejecting such modifications based on the rules of the optimization.").

In other words, the invention incorporates--rather than eliminates--the delivery constraints to which all linacs are subject. By definition, a linac can only deliver radiation that meets these constraints; it cannot, by contrast, deliver what it cannot deliver. Because "radiation output" refers to a "measure of the rate of radiation delivered by the linac," and linacs are necessarily subject to the very delivery constraints that the invention claims to directly take into account, Prowess's proposed construction is redundant. The Court will construe "radiation output" to mean "measure of the rate of radiation delivered by the linac."

### 2. "minimal accurate dose amount"

| Claim Language | Prowess's Proposed Construction | The Defendants' Proposed Construction |
|---|---|---|
| *minimal accurate dose amount* | minimum amount of dose to produce an accurate beam according to the linac's constraints | minimum amount of dose to produce an accurate beam |

The phrase "minimal accurate dose amount" also appears in dependent Claim 23 of the '008 patent, which asserts: "[t]he medium of claim 22, wherein the limitation on operations of the linear accelerator comprise at least one of: a radiation output, *a minimal accurate dose amount* and a conveyance speed for the linear accelerator." '008 patent col. 12 ll.26-29 (emphasis

45

added).  The parties agree that "minimal accurate dose amount"
refers to the "minimum amount of dose to produce an accurate
beam."

The parties dispute whether the minimum amount of dose to
produce an accurate beam must be delivered "according to the
linac's constraints."  Prowess argues that claim language
supports adding "according to the linac's constraints" to the
construction because the claim is "directed to a term on the
operations of the linear accelerator," and linacs "differ in
their ability to dynamically adjust dose rates."  Prowess's
Opening Br. (SEALED) at 49.  The Defendants contend that
"[t]hose familiar with radiation treatment planning . . .
understand that a user or planner can freely designate
parameters, such as the minimum dose rate setting, when creating
a plan."  Defendants' Opening Br. (SEALED) at 30.

The Defendants' construction is correct.  Namely, Prowess's
construction is unnecessary because the newness of the claimed
optimization method--emphasized throughout the specification--is
that it directly considers "all delivery constraints" in
generating a treatment plan.  *E.g.*, '008 patent col. 3 ll.15-27.
Accordingly, the minimum amount of dose to produce an accurate
beam, delivered by the linac, must necessarily meet the linac's
limitations.  The Court will construe "minimal accurate dose

amount" to mean "minimum amount of dose to produce an accurate beam."

### 3. "objective function"

| Claim Language | Prowess's Proposed Construction | The Defendants' Proposed Construction |
|---|---|---|
| *objective function* | mathematical function expressing a set of conditions to be optimized | a mathematical function expressing a set of <u>user-defined clinical objectives of the treatment plan</u> to be optimized |

The term "objective function" appears in Claims 1, 7, 9, 10, 12, 14, 16-18, 20, and 25.[67] Claim 1 asserts

> [a] method for planning radiation treatment of a target area . . . said method comprising . . . evaluating the initial radiation to the patient against an *objective function*; altering the initial aperture configuration based on the geometric constraints of the collimator; calculating an altered radiation dose distribution to the patient based on the altered aperture configuration and re-evaluating the altered radiation output against the *objective function*; re-altering the altered aperture configuration; re-calculating the altered radiation dose distribution to the patient and re-evaluating the altered radiation output for the re-altered aperture configuration until the *objective function* is satisfied, wherein the *objective function* scores the radiation treatment plan quality and is a function of the altered radiation dose distribution at a given iteration . . . .

---

[67] The term also appears in Claim 4 of the '591 patent.

47

'008 patent cols. 9-10 (emphases added). The parties agree that
"objective function" relates to a "mathematical function"
reflecting certain conditions (or "objectives") "to be
optimized." They dispute whether the set of conditions
expressed by the mathematical function, to be optimized by that
function, is necessarily user-defined.

Prowess contends that: (1) "nothing in the claims" requires
"anything" to be performed by a user; (2) when the applicants
intended a claim element to require a "user," they expressly
included such a term; and (3) Claim 20 of the '008 patent "makes
clear" that a computer-readable medium can be encoded with a
computer program to execute the claimed steps. Prowess's
Opening Br. (SEALED) at 14. The Defendants object that "[t]hose
of ordinary skill in the art of radiation treatment planning
understand an objective function to be a function that is to be
minimized during the treatment plan optimization process, and is
defined by the clinical objectives as set forth by the planner."
Defendants' Opening Br. (SEALED) at 24.

The word "user" does not appear in any of the '008 or '591
patent claims. *See generally* '008 and '591 patents. However,
the claims "should be read within the context of the entire
patent, including the specification." *Pulse*, 2009 WL 6898404,
at *2. Contrary to Prowess's suggestion, *see* Prowess's Opening
Br. (SEALED) at 16, the specification refers to user partici-

48

pation. Figure 1 of the '008 patent, which "shows a flow chart of the DAO procedure,"[68] is illustrative:



FIG. 1

Although the Figure does not expressly indicate what steps, if any, involve user participation, the text of the patent's specification does:

[68] '008 patent col. 6 l.3.

In a first step **60**, the mode of delivery is selected. The modes of delivery include IMRT, IMAT, or hybrid IMRT. If fixed field IMRT or hybrid IMRT is selected, in a step **61**, *the user must select the delivery angles and the number of apertures assigned to each angle.* Then *one* proceeds to step **62a** if one selected hybrid IMRT in a step **60**. Otherwise, if *one* selected fixed field IMRT in a step 60, then *one* proceeds immediately to a step **63**. *If the user selects IMAT in a step 60, then the user proceeds immediately to step 62a.*

In a step **62a**, *one* must select the number of arcs and the range for each arc. After the consideration factors (the delivery angles and number of apertures assigned to each angle for DIRT or the number of arcs and range for each arc for IMAT) are entered, in a step 62b, the treatment planning system automatically calculates evenly spaced radiation beams to approximate the range of rotation of the gantry. Hybrid IMRT required both steps **61** and **62** to account for the combined use of fixed field and arced delivery.

In a step **63**, each field is divided into a grid of discrete pencil beams and the dose distribution for each pencil beam is computed. The MLC delivery constraints for fixed field delivery are determined in a step **64**. For rotation delivery in a step **64**, the constraints associated with rotational delivery are also determined to ensure not only coordination of MLC movement with radiation delivery, but also the synchronization of radiation delivery and gantry rotation.

*See* '008 patent col. 6 ll.23-49 (italicized emphases added). Of

particular relevance here, the specification continues:

*In a step 65, the user defines the clinical objectives of the treatment plan. These clinical objectives are used to score the quality of the treatment plan throughout the optimization process.* The treatment plan quality can be scored by an objective function that reduces the treatment plan into a single numerical value. The objective function can be, by way of example only, a least-square dose difference objective between the desired dose and the achieved

> dose. The objective function can also be based on dose volume histograms (DVH) or biological based parameters.
>
> The optimization process begins in a step **66**, where the treatment planning system assigns an initial aperture shape for each beam angle.
>
> . . . .

*Id.* col. 6 ll.50-62 (italicized emphases added). Before reciting the claims, the specification provides, "[w]hile the disclosure above describes the invention in detail . . . it will be apparent to one of ordinary skill in the art that various changes and modifications can be made therein without departing from [its] spirit and scope." *Id.* col. 9 ll.32-36.

"When consulting the specification to clarify the meaning of claim terms, courts must take care not to import limitations into the claims from the specification." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009). Thus, when the specification describes a single embodiment to enable the invention, the Court will not limit broader claim language to that application "unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted); *see id.* at 907-08 (*citing Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1301 (Fed. Cir. 1999), *Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766,

770 (Fed. Cir. 1996), and *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1551 (Fed. Cir. 1996) as examples where the Federal Circuit "interpreted the pertinent claim language narrowly, not merely because the specification did not describe a broader embodiment, but because the specification . . . made clear that the invention was limited to a particular structure").

Here, the description of the invention, as it pertains to how the "objective function" is generated, is detailed and unequivocal. Step 65 of the DAO procedure--entitled "Decide upon clinical objectives"--is explained as follows: "In a step **65**, *the user defines the clinical objectives* of the treatment plan." '008 patent col. 6 ll.50-51 (italicized emphasis added). These user-defined clinical objectives are, in turn, used to score the quality of the treatment plan by the objective function. *Id.* col. 6 ll.51-54. The Defendants' proposed construction incorporates this express limitation; Prowess's does not.[69] Thus, the Defendants' construction is correct. The

---

[69] Prowess argues that the doctrine of claim differentiation requires the Court to adopt its construction. *See, e.g.*, Prowess's Opening Br. (SEALED) at 14. Specifically, Prowess notes that dependent Claim 13--which depends from Claim 1--and dependent Claim 26--which depends from Claim 25--expressly reference an "operator," and "no such requirement" can be found in the claims where "objective function" appears. *Id.* Under the doctrine of claim differentiation, "the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the

Court will construe "objective function" to mean "a mathematical function expressing a set of user-defined clinical objectives of the treatment plan to be optimized."

### 4. "providing a signal"

| Claim Language | Prowess's Proposed Construction | The Defendants' Proposed Construction |
|---|---|---|
| *providing a signal* | No construction required--plain and ordinary meaning | Cannot be construed--insolubly ambiguous |

The term "providing a signal" appears in Claims 9 and 10. Both depend from Claim 8, which in turn depends from Claim 1. Claim 9 asserts "[t]he method of claim 8, further comprising *providing a signal* for at least one optimized aperture size once the objective function is satisfied." '008 patent col. 10 ll.42-44 (emphasis added). Claim 10 asserts "[t]he method of claim 8, further comprising *providing a signal* for at least one

---

independent claim." *Liebel-Flarsheim*, 358 F.3d at 910. The Court does not agree that the doctrine applies here, given that the limitation in dispute is not the only meaningful difference between the dependent and independent claims at issue. *See Wenger Mfg., Inc. v. Coating Machinery Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("Claim differentiation, while often argued to be controlling when it does not apply, is clearly applicable when there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, and that limitation is the only meaningful difference between the two claims."). More importantly, the presumption--to the extent it arises--can be overcome when "the circumstances suggest a different explanation." *Liebel-Flarsheim*, 358 F.3d at 901. For the reasons stated above, such circumstances are present here.

optimized aperture weight once the objective function is
satisfied. *Id*. col. 10 11.45-47 (emphasis added).

Prowess argues that "providing a signal" requires no
construction because it has a plain and ordinary meaning.
Prowess's Opening Br. (SEALED) at 26. The Defendants assert
that neither patent "describes" any such signal, and it is
unclear what would provide the signal and to what or to whom it
would be provided. Defendants' Opening Br. (SEALED) at 40. The
Defendants conclude that the term is "insolubly ambiguous and
not amenable to construction." *Id*.

A claim is definite if "one skilled in the art would
understand the bounds of the claim when read in light of the
specification." *Exxon Research & Eng'g*, 265 F.3d at 1375. A
construed claim can be indefinite if the construction remains
insolubly ambiguous, meaning that it "fails to provide
sufficient clarity about the bounds of the claim to one skilled
in the art." *Star Scientific*, 655 F.3d at 1373. A claim is not
indefinite merely when discerning the meaning poses a "formida-
ble [task]" and the conclusion "may be one over which reasonable
persons will disagree." *Source Search Techs.*, 588 F.3d at 1076
(internal quotation marks omitted).

Claims 9 and 10 do not define "providing a signal";
however, the specification sheds light on the term's meaning.
The detailed description of the invention explains:

54

[a]t a given time during the delivery of radiation to
a patient, the [Linac Control System, or "LCS"] is
receiving information on dose delivery from the dose
control unit. The LCS also receives information in
real-time from the MLC position sensors. The LCS
compares the dose delivery information from both the
MLC controller and the dosimetry system controller
with the prescription. Depending on the result of the
comparison, the LCS may respond in a variety of
manners. For example, the LCS may *send a signal to
the beam triggering system to pause the radiation* so
that the MLC can advance to the proper location.

'008 patent col. 5 ll.48-59 (emphasis added). The prosecution

history also supports Prowess's position: although the PTO

issued four office actions[70] during the prosecution history,

Claims 9 and 10 were ultimately issued in the same form as

initially filed by the inventors. Popple Decl. (SEALED) ¶ 61.

*See generally* Prowess's Opening Br. (SEALED), Ex. E (file

history for '008 patent). Thus, the Court agrees with Prowess

that the term "providing a signal" has a plain and ordinary

meaning--to supply an indication or notification--and, when read

in light of the specification, is not insolubly ambiguous.

---

[70] "Office action" refers to a patent examiner's communication
with a patent applicant, "usu[ally] to state the reasons for
denying an application." *Black's Law Dictionary* 1190 (9th ed.
2009). "Final Office action" denotes the examiner's
determination that an application is not allowable. *Id.*

### 5. "reiterative evaluation"

| Claim Language | Prowess's Proposed Construction | The Defendants' Proposed Construction |
|---|---|---|
| *reiterative evaluation* | No construction required--plain and ordinary meaning | Cannot be construed-- insolubly ambiguous |

The term "reiterative evaluation" appears in dependent
Claims 17 and 18. Claim 17 asserts "[t]he method of claim 16,
wherein after said objective function is satisfied, *reiterative
evaluation* in reference to geometric and physical constraints of
the collimator is not performed." '008 patent col. 11 ll.28-31
(emphasis added). Claim 18 asserts "[t]he method of claim 17,
wherein the radiation source includes a linear accelerator, said
method further comprising: designating a limitation on operation
of the linear accelerator prior to calculating the initial
radiation output, wherein after said objective function is
satisfied, *reiterative evaluation* in reference to the
limitations on the operation of the linear accelerator is not
performed." *Id.* col. 11 ll.32-38 (emphasis added).

Prowess argues that no construction is required, because
"reiterative evaluation" has a plain and ordinary meaning: i.e.,
repeated or successive evaluation. Prowess Opening Br. (SEALED)
at 23. The Defendants argue that the term "does not have a

widely accepted meaning or a particular meaning in the field,"
and is insolubly ambiguous. Defendants' Opening Br. (SEALED) at
41.

As discussed above, a claim is definite if "one skilled in
the art would understand the bounds of the claim when read in
light of the specification." *Exxon Research & Eng'g*, 265 F.3d
at 1375. Here, the specification--citing Figure 1, *see supra*
Page 49--explains:

> [i]n the preferred embodiment of this invention, a
> simulated annealing algorithm is used in steps 67
> through 70 to determine the optimal aperture shapes
> and corresponding weights. The optimization algorithm
> randomly selects a variable from the set of variables
> considered in the optimization process, i.e., the MLC
> leaf positions and the weights of the aperture shape.
> For the selected variable, a change of random size is
> sampled from a probability distribution. For
> instance, a Gaussian distribution could be used. In
> addition, the shape of the curve could change with
> *successive iteration* of the procedure.

'008 patent col. 7, ll.40-50. The patent examiner never
objected to the term on grounds of indefiniteness. Popple Decl.
(SEALED) ¶ 69. *See generally* Prowess's Opening Br. (SEALED),
Ex. E (file history for '008 patent).

Thus, the Court agrees with Prowess that "reiterative
evaluation" has a plain and ordinary meaning--repeated or
successive evaluation--and, when read in light of the
specification, is not insolubly ambiguous.

## 6. "designating"

| Claim Language | Prowess's Proposed Construction | The Defendants' Proposed Construction |
|---|---|---|
| *designating* | No construction required--plain and ordinary meaning | indication made by a user |

"Designating" appears in Claims 1, 4, 18, 20, 25, 27, and 28, in reference to geometric constraints on the collimator or linac. For instance, Claim 1 asserts "[a] method for planning radiation treatment of a target area . . . said method comprising: *designating* geometric constraints for the collimator." '008 patent col. 9 ll.38-44 (emphasis added). Dependent Claim 4 asserts "[t]he method of claim 1, wherein the radiation source comprises a linear accelerator, said method further comprising: *designating* a limitation on operations of the linear accelerator prior to calculating the initial radiation dose distribution to the patient." *Id.* col. 10 ll.22-27 (emphasis added). Independent Claim 20 claims "[a] computer readable medium" that is "encoded with a computer program for executing: *designating* geometric constraints for the collimator." *Id.* col. 11 ll.42-49 (emphasis added).

Prowess argues that no construction of "designating" is required, because the term has a plain and ordinary meaning:

"*the act of identifying or indicating.*"  Prowess Opening Br. (SEALED) at 23, 28 (emphasis in original).  The Defendants argue that "[t]hose of ordinary skill in the art of radiation treatment planning understand that a planner, such as a dosimetrist or physicist, designates or selects the constraints and parameters in the treatment planning system."  Defendants' Opening Br. (SEALED) at 27.

The Court agrees with Prowess.  First, the claim language clearly indicates that a program--as opposed to an individual-- is capable of "designating" linac and collimator constraints. *See* '008 patent col. 11 ll.46-49 (Claim 20 asserts a "computer readable medium encoded with a computer program for executing: designating geometric constraints for the collimator").  Ambiguity in the specification cautions against inserting a "user" requirement into the construction.  *See Abbott Labs.*, 566 F.3d at 1288; *Liebel-Flarsheim*, 358 F.3d at 906.  Namely, in describing Step 64 of Figure 1[71] ("Define geometric constraints for delivery mode and linac"), the specification provides: "The MLC delivery constraints for fixed field delivery *are determined* in a step **64**.  For rotation delivery in a step **64**, the constraints associated with rotational delivery *are also determined* . . . ."  '008 patent col. 6 ll.46-49 (italicized emphases added).  The specification's failure to indicate

---

[71] *See supra* Page 49.

whether an individual must designate the constraints of the linac and collimator is conspicuous in light of Step 65 ("Decide upon clinical objectives"), wherein "*the user* defines the clinical objectives of the treatment plan." *Id.* col. 6 ll.50-51 (emphasis added).

Because the claim language clearly indicates that "designating" can be performed by a computer program as well as an individual, the Defendants' construction will not be adopted.

7. **"selecting"**

| Claim Language | Prowess's Proposed Construction | The Defendants' Proposed Construction |
|---|---|---|
| *selecting* | No construction required--plain and ordinary meaning | choice made by a user |

"Selecting" appears in Claims 1, 13, 16, 25, 26, and 28.[72] For instance, independent Claim 1 asserts "[a] method for planning radiation treatment of a target area . . . said method comprising . . . assigning an initial aperture configuration for passing the radiation beam based on the designated geometric constraints of the collimator comprising *selecting* a number of delivery angles for the radiation beam towards the target area and a number of apertures through which the radiation beam is

---

[72] The term also appears in '591 patent Claims 1 and 2.

directed; and *selecting* a number and range of arcs for the gantry . . . ." '008 patent col. 9 ll.38-51 (emphases added). Independent Claim 25 asserts: "[a] method for planning radiation treatment of a target area . . . said method comprising: *selecting* at least one of a set of parameters a) and b), wherein a) comprises a number of delivery angles for the radiation beam toward the target area and a number of apertures through which the radiation beam is directed, and wherein b) comprises a number and range of arcs for the gantry . . . ." *Id.* col. 12 ll.36-46. Prowess argues that "selecting" does not require a user term; the Defendants contend that it does. *See* Prowess's Opening Br. (SEALED) at 36; Defendants' Opening Br. (SEALED) at 27.

As with the term "designating," claim language strongly suggests that a user--though capable of "selecting"--is not required. Specifically, Claim 13--which depends from independent Claim 1--provides, "[t]he method of claim **1**, wherein the *selecting* of the number of delivery angles and the *selecting* of the number and range of arcs are *selected by an operator*." '008 patent col. 10 ll.56-58 (italicized emphases added). Similarly, Claim 26--which depends from independent Claim 25-- asserts, "[t]he method of claim **25**, wherein *selecting* at least one of a) and b) *is provided by an operator*." *Id.* col. 12 ll.66-67 (italicized emphasis added). The *only* distinction

61

between the above-cited dependent claims and their independent counterparts is the additional requirement that a "user" perform the selecting. *Cf. Wenger Mfg.*, 239 F.3d at 1233. Because each claim in a patent is "presumptively different in scope," *id.*, this language supports Prowess's argument that a user may--but need not--do the "selecting." *See also SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003) (presumption is "especially strong" when "the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim").

Although the doctrine of claim differentiation creates only a presumption, which can be overcome by "strong contrary evidence such as definitional language in the patent or a clear disavowal of claim scope,"[73] no such evidence is present here. Specifically, although the specification suggests that a user is required to make certain selections,[74] "a simulated annealing algorithm is used in steps **67** through **70** to determine the

---

[73] *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1324 (Fed. Cir. 2012); *see also id.* at 1325 ("The administrative law judge's construction of the term "code" in claim 1 as meaning "spreading code" renders claim 5 superfluous, a result that counsels strongly against that construction.").

[74] *E.g.*, '008 patent col. 6 ll.25-28 ("If fixed field IMRT or hybrid IMRT is selected, in a step **61**, *the user must select* the delivery angles and the number of apertures assigned to each angle." (italicized emphases added)).

optimal aperture shapes and corresponding weights. The

*optimization algorithm randomly selects* a variable from the set

of variables considered in the optimization process." '008

patent col. 7 ll. (italicized emphases added). Thus, the

Defendants' proposed construction of "selecting"—defined as a

"choice made by a user"--cannot stand.

8. **"receiving a selected a [sic] mode for radiation treatment including one of: a fixed field intensity modulated radiotherapy, an intensity modulated arc therapy, and a hybrid treatment of intensity modulated radiotherapy and intensity modulated arc therapy"**

| Claim Language | Prowess's Proposed Construction | The Defendants' Proposed Construction |
|---|---|---|
| *receiving a selected a mode for radiation treatment including one of: a fixed field intensity modulated radiotherapy, an intensity modulated arc therapy, and a hybrid treatment of intensity modulated radiotherapy and intensity modulated arc therapy* | receiving a selected mode of radiation treatment, where the modes of delivery include a fixed field intensity modulated radiotherapy, an intensity modulated arc therapy, and a hybrid treatment of intensity modulated radiotherapy and intensity modulated arc therapy | receiving from a user a selected mode of radiation treatment, where the available modes of delivery include a fixed field intensity modulated radiotherapy, an intensity modulated arc therapy, and a hybrid treatment of intensity modulated radiotherapy and intensity modulated arc therapy |

The above-quoted term appears in independent Claim 20,

which asserts "[a]computer readable medium for planning

radiation treatment of a target area [that is] encoded with a
computer program for executing . . . receiving a selected a
[sic] mode for radiation treatment including one of: a fixed
field intensity modulated radiotherapy, an intensity modulated
arc therapy, and a hybrid treatment of intensity modulated
radiotherapy and intensity modulated arc therapy . . . ." '008
patent col. 11 ll.42-54.

Prowess argues that, "[a]s written, the claim simply
requires receiving a selected mode of radiation treatment
including fixed field, arc, and a hybrid (or combination) of
both." Prowess's Opening Br. (SEALED) at 34. The Defendants
contend that "receiving a selected [] mode" "require[s] that
more than one option of the type of treatment planning delivery
systems must be available for selection by the planner.
Otherwise, no selection could be made." Defendants' Opening Br.
(SEALED) at 17.

Claim 20 does not contain the word "user." As discussed
above, other claim language supports Prowess's argument that
"selecting," as a general matter, can be performed by a user or
a program. The question is whether a user is required to
select, at the outset, the mode of delivery of the radiation
treatment. The detailed description of the invention states
that, "[d]uring treatment planning, a user is allowed to set the
mode of treatment including IMRT or IMAT or a hybrid thereof."

64

'008 patent col. 5 ll.27-29.  Citing Figure 1, the specification

further provides, "[i]n a first step **60**, the mode of delivery is

selected.  The modes of delivery include IMRT, IMAT, or hybrid

IMRT."  *Id.* col. 6 ll.23-25.  Thus, the patentee has not

"demonstrated a clear intention to limit the claim scope using

words or expressions of manifest exclusion or restriction."

*Liebel-Flarsheim*, 358 F.3d at 906 (internal quotation marks

omitted).  This being the case, Prowess's construction is

correct.  The Court will not construe the claim to require a

"user."

9. **"selecting at least one of a set of parameters a) and b)"**
   **and variations thereof**

| Claim Language | Prowess's Proposed Construction | The Defendants' Proposed Construction |
|---|---|---|
| *selecting at least one of a set of parameters a) and b)*<br><br>*selecting at least one of a) and b)*<br><br>*selecting at least one of the set of parameters a) and b)* | No construction required--plain and ordinary meaning | A user choosing a set of parameters wherein the parameters available for selection include a), b), and a combination of a) and b) |

The phrase "selecting at least one of a set of parameters

a) and b)"--and variations thereof--appears in independent Claim

65

25 and dependent Claim 26.[75]  Claim 25 asserts, in relevant part,

"[a] method for planning radiation treatment of a target area .

. . said method comprising: selecting at least one of a set of

parameters a) and b), wherein a) comprises a number of delivery

angles for the radiation beam toward the target area and a

number of apertures through which the radiation beam is

directed, and wherein b) comprises a number and range of arcs

for the gantry."  '008 patent col. 12 ll.36-46.  Claim 26 claims

"[t]he method of claim 25, wherein selecting at least one of a)

and b) is provided by an operator."  *Id.* col. 12 ll.66-67.

Prowess argues that the phrase requires no construction,

because it has a plain and ordinary meaning.  Prowess's Opening

Br. (SEALED) at 38.  As with the preceding claim term, the

Defendants argue that the plain and ordinary meaning of

"select"--and as one of skill in the art would understand the

term--requires "more than one option of the type of treatment

planning delivery systems" to be available for selection "by the

planner"; "[o]therwise, no selection could be made."

Defendants' Opening Brief (SEALED) at 17.

As discussed at length above,[76] the Defendants' proposed

"user" requirement is foreclosed by the doctrine of claim

differentiation.  Namely, Claim 26--which depends from

---

[75] The phrase also appears in '591 patent Claims 1 and 2.

[76] *See supra* Pages 61-62.

independent Claim 25--asserts, "[t]he method of claim **25**, wherein *selecting* at least one of a) and b) *is provided by an operator*." *Id.* col. 12 ll.66-67 (italicized emphases added). Because the *only* distinction between Claim 26 claims and its independent counterpart is the additional requirement that a "user" perform the selecting--and each claim in a patent is presumed different in scope--the Court will not import a user requirement into the independent language. *Cf. Wenger Mfg.*, 239 F.3d at 1233; *see also SunRace*, 336 F.3d at 1303.

Neither will the Court construe the claim to expressly require a "combination" of a) and b). First, unlike Claim 20-- which specifically lists three "mode[s]" of radiation treatment (IMRT, IMAT, and hybrid),[77] Claim 25 does not. More importantly, the Defendants' proposed "combination" language is unnecessary because the phrase "at least" already indicates that parameters a) (a number of delivery angles and apertures) and b) (a number and range of arcs) can be selected at the same time. *See* '008 patent col. 12 ll.30.[78] Otherwise, the claim would simply read "a) or b)". *See Chef Am., Inc. v. LambWeston, Inc.*, 358 F.3d 1371, 1373 (Fed. Cir. 2004) ("[O]rdinary, simple English words

---

[77] *See* '008 patent col. 11 ll.50-54.

[78] Claim 26 similarly provides for "[t]he method of claim **25**, wherein *selecting at least one of a) and b)* is provided by an operator." '008 patent col. 12 ll.66-67 (italicized emphasis added).

whose meaning is clear and unquestionable . . . mean exactly what they say."). The term requires no construction.

### 10. "aperture configuration for passing the radiation beam"

| Claim Language | Prowess's Proposed Construction | The Defendants' Proposed Construction |
|---|---|---|
| aperture configuration for passing the radiation beam<br><br>aperture configuration for the radiation beam | No construction required--plain and ordinary meaning | aperture configuration, which takes into account the machine parameters, for passing the radiation beam such that the beam is deliverable |

"Aperture configuration for passing the radiation beam" appears in independent Claims 1, 16, and 25.[79] By way of example, Claim 1 asserts "[a] method for planning radiation treatment of a target area . . . said method comprising: designating geometric constraints for the collimator; [and] assigning an initial *aperture configuration for passing the radiation beam* based on the designated geometric constraints of the collimator comprising selecting a number of delivery angles for the radiation beam towards the target area and a number of apertures through which the radiation beam is directed." '008 patent col. 9 ll.38-50 (emphasis added). "Aperture

---

[79] A variant appears in '591 patent Claim 1.

configuration" is expressly defined in Claim 1 as "a plurality of aperture shapes delivered from the selected delivery angles, selected number of apertures through which the radiation beam is directed, and the selected number and range of arcs for the gantry to the target area." *Id.* col. 10 ll.4-8.

Prowess argues that the term is "readily understood to a lay person and one of skill in the art." Prowess Opening Br. (SEALED) at 43. The Defendants assert that the ordinary meaning is "not readily apparent," and argue that a "review of the specification" leads to their proposed construction. Defendants' Opening Br. (SEALED) at 22. Prowess objects that there is "no credible justification for injecting these limitations into the terms, and Defendants' positions are self-contradicting." Prowess's Responsive Br. (SEALED) at 13.

The Defendants cite two portions of the specification in support of their proposed construction. First, in summarizing the invention, the specification provides that, "[t]he output of the algorithm is a set of deliverable apertures and their weights, which can be transferred to the control system or a linear accelerator and delivered to a patient." '008 patent col. 3 ll.59-62. Second, in describing a MLC, the specification notes that "static and dynamic geometric constraints determine the kind of aperture shapes that a particular MLC can form." *Id.* col. 4 ll.46-48.

69

Neither supports the proposed construction.  As to the requirement that the configuration "take[] into account the machine parameters," this language is unnecessary because Claim 1 expressly states that the aperture configuration must be "based on the designated geometric constraints of the collimator."  *See id.* col. 9 ll.46-47.  As for the requirement that the beam be deliverable, the cited portion of the specification (the "output" of the claimed algorithm is a set of "deliverable" apertures) has no application to the claim language at issue: the term appears in Claims 1, 16, and 25 solely in reference to "initial" planning steps that precede the algorithmic output.  The parties agree that "aperture" means "shaped opening."  Joint Claim Constr. Statement (SEALED) at 1.  The '008 patent defines "configuration."  *See supra.*  No further construction is required.

### 11. "receiving a designation"

| Claim Language | Prowess's Proposed Construction | The Defendants' Proposed Construction |
|---|---|---|
| *receiving a designation* | No construction required--plain and ordinary meaning | receiving from a user a designation |

The term "receiving a designation" appears in dependent Claim 22, which asserts "[t]he medium of claim **20**, wherein the radiation source comprises a linear accelerator, said computer readable medium encoded with a computer program for executing, further executes: *receiving a designation* of a limitation on operations of the linear accelerator prior to calculating the radiation dose distribution." '008 patent col. 12 ll.19-25 (italicized emphasis added). Prowess argues that the term is "readily understood to a lay person and one of skill in the art." Prowess's Opening Br. (SEALED) at 51. The Defendants contend that "[t]hose of ordinary skill in the art of radiation treatment planning understand that a planner, such as a dosimetrist or physicist, designates or selects the constraints and parameters in the treatment planning system." Defendants' Opening Br. (SEALED) at 27.

Claim 22 depends from Claim 20, which--as discussed above[80]--expressly contemplates that a computer program designate geometric constraints for the collimator. *See* '008 patent col. 11, ll.46-49. The Court, accordingly, concluded that a user is not required to perform the act of "designating." *Supra* Page 60. Claim 22 similarly asserts, on its face, a computer program that is capable of receiving the designation once made. No construction is required.

---

[80] *See supra* Pages 58-60.

## 12. "until the objective function is satisfied"; "that satisfies an objective function"

| Claim Language | Prowess's Proposed Construction | The Defendants' Proposed Construction |
|---|---|---|
| *until the objective function is satisfied*<br><br>*that satisfies an objective function* | No construction required--plain and ordinary meaning | Cannot be construed-- insolubly ambiguous |

Finally, the parties dispute the definiteness of "until the objective function is satisfied" and "that satisfies an objective function." The former term appears in Claims 1, 16, 20, and 25; the latter appears in '591 patent Claims 3 and 4. For instance, Claim 1 asserts "[a] method for planning radiation treatment of a target area . . . said method comprising . . . re-calculating the altered radiation dose distribution to the patient and re-evaluating the altered radiation output for the re-altered aperture configuration *until the objective function is satisfied*, wherein the objective function scores the radiation treatment plan quality and is a function of the altered radiation dose distribution at a given iteration." '008 patent cols. 9-10 (emphasis added).

Prowess contends that the terms do not require construction because they carry plain and ordinary meaning, Prowess's Opening

Br. (SEAELD) at 55; the Defendants argue that the terms are "not amenable to construction" and insolubly ambiguous, Defendants' Opening Br. (SEALED) at 37. Specifically, the Defendants note that "each of the asserted claims fails to state or suggest what criteria a person of ordinary skill in the art would use to determine whether the objective function has been 'satisfied,' if in fact satisfying an objective function were even possible." Defendants' Opening Br. (SEALED) at 38. Instead, "[a] user of the claimed method or computer readable medium would be free to select any criteria for satisfying an objective function, and accordingly, determining whether the objective function were satisfied, again if that were possible, would vary from user to user." *Id.* Because the objective function is "necessary" to practice the alleged invention, the Defendants conclude that all of the '008 patent claims are invalid. *Id.* at 39-40.

The Defendants rely on *Honeywell International, Inc. v. International Trade Commission*, 341 F.3d 1332 (Fed. Cir. 2003) in support of their invalidity contention. The patent in *Honeywell* required that yarn produced by the claimed process "fall within a specified MPE range at some point during the process." *Id.* at 1335. The patent defined "MPE" as "the difference between the specimen melting point (M.P.) and the melting point (M.P.Q.) of a specimen after subsequent rapid liquid nitrogen quenching of an encapsulated [differential

73

scanning calorimeter] sample from the melt." *Id.* (internal quotation marks omitted). However, neither the claims, the written description, nor the prosecution history referenced any of the four known preparation methods that could be used to measure the MPE. *Id.* at 1339. The Federal Circuit agreed with the Commissioner that the claims were insolubly ambiguous, and hence indefinite, with respect to a required sample preparation method. *Id.* at 1340.

According to Prowess, the '008 patent does not specify satisfaction criteria "in an absolute sense" because the criteria are necessarily different for each treatment plan, depending on, among other things, tumor location, dose prescription, linac limitations, tissue type, etc. Prowess Responsive Br. (SEALED) at 23. Prowess argues that the claims are not invalid as indefinite because "[a] person having ordinary skill in the art would readily understand how to define termination criteria for satisfying the objective function." *Id.* (*citing Marley Mouldings v. Mikron Indus., Inc.*, 417 F.3d 1356, 1360-61 (Fed. Cir. 2005) (§ 112 ¶ 2 is satisfied when the relevant values can be calculated, measured, or "easily obtained")). Prowess's expert, Doctor Popple, asserts that "[o]bjective functions and optimization have known methodologies to those having ordinary skill [in] the art." Popple Supplemental Decl. (SEALED) ¶ 33.

Critically, the Defendants do not object to the term "objective function" as insolubly ambiguous;[81] indeed, for the reasons stated above, the Court will adopt the Defendants' proposed construction of the term to denote "a mathematical function expressing a set of user-defined clinical objectives of the treatment plan to be optimized." *See supra* Page 53. The Defendants challenge the definiteness of determining when that function has been "satisfied." However, the specification explains that the optimization procedure "ceases" "[b]ased on pre-defined termination criteria which are dictated by the optimization algorithm." '008 patent col. 8 ll.3-5; *id.* col. 8, ll.6-10 ("The plan with the optimal value of the objective function is deemed the optimal plan. This optimum treatment plan is a set of deliverable aperture shapes and the intensities associated with each aperture shape."). Thus, the term is not insolubly ambiguous.

## 13. Additional Invalidity Contentions

In addition to arguing that certain terms are insolubly ambiguous, the Defendants assert that several of the asserted claims are invalid. Defendants' Opening Br. (SEALED) at 33-37, 41-43. Specifically, the Defendants argue that Claims 16-19 and 25-27 do not "particularly point out and distinctly claim the subject matter which the patentee regards as his invention," and

---

[81] *See supra* Page 47.

Claims 2 and 20-24 are indefinite. *Id.* "Ambiguity, undue breadth, vagueness, and triviality are matters which go to claim *validity* for failure to comply with 35 U.S.C. § 112 ¶ 2, not to interpretation or construction." *Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989); *see also Rhine v. Casio, Inc.*, 183 F.3d 1342, 1346 (Fed. Cir. 1999) (defendants "cannot avoid a full-blown validity analysis by raising the specter of invalidity during the claim construction phase"). Because the Defendants' arguments as to claim invalidity are premature, the Court will not consider them here.

C. Construed Terms

For the reasons stated above, the disputed claim terms will be construed as follows:

| Term | Construction |
|---|---|
| *radiation output* | measure of the rate of radiation delivered by the linac |
| *minimal accurate dose amount* | minimum amount of dose to produce an accurate beam |
| *objective function* | a mathematical function expressing a set of user-defined clinical objectives of the treatment plan to be optimized |
| *providing a signal* | Plain and ordinary meaning |
| *reiterative evaluation* | Plain and ordinary meaning |
| *designating* | Plain and ordinary meaning |
| *selecting* | Plain and ordinary meaning |

| | |
|---|---|
| *receiving a selected a mode for radiation treatment including one of: a fixed field intensity modulated radiotherapy, an intensity modulated arc therapy, and a hybrid treatment of intensity modulated radiotherapy and intensity modulated arc therapy* | receiving a selected mode of radiation treatment, where the modes of delivery include a fixed field intensity modulated radiotherapy, an intensity modulated arc therapy, and a hybrid treatment of intensity modulated radiotherapy and intensity modulated arc therapy |
| *selecting at least one of a set of parameters a) and b); selecting at least one of a) and b);* **and** *selecting at least one of the set of parameters a) and b)* | Plain and ordinary meaning |
| *aperture configuration for passing the radiation beam; aperture configuration for the radiation beam* | Plain and ordinary meaning |
| *receiving a designation* | Plain and ordinary meaning |
| *until the objective function is satisfied; that satisfies an objective function* | Plain and ordinary meaning |

III. Conclusion

For the reasons stated above, the Defendants' motion for
leave to file amended answers will be denied; the Defendants'
motion to supplement the record will be granted; and the
disputed claims will be construed as discussed herein.

_2/9/13_
Date

William D. Quarles, Jr.
United States District Judge